**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL J. BETTUCCIO,       )
                                  )
           Plaintiff,       )
                                  )
          v.             )      Civil Action No. 12-1512
                                  )      Judge Nora Barry Fischer
CAROLYN W. COLVIN,       )
Commissioner of Social Security,   )
                                  )
          Defendant.     )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Michael J. Bettuccio ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381-1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (Docket Nos. 10, 13). The record has been developed at the administrative level, although Plaintiff seeks to supplement same with alleged "new and material evidence." For the following reasons, Plaintiff's Motion for Summary Judgment [10] is granted, in part, and denied, in part and Defendant's Motion for Summary Judgment [13] is denied.

### II.    PROCEDURAL HISTORY

Plaintiff applied for DIB on February 8, 2008, and SSI on August 10, 2010, claiming a disability onset of April 1, 2007. (R. at 142 – 56).[1] Plaintiff filed amendments to his application for DIB on September 1, 2010. (R. at 157-58). At the outset, Plaintiff claimed disability from all work due to arthritis in his knees, a meniscal tear, exposed bone and bipolar disorder. (R. at

---

[1]    Citations to ECF Nos. 7 – 7-12, the Record, *hereinafter*, "R. at __."

176).  Plaintiff was initially denied benefits on June 9, 2008.  (R. at 58 – 62).  Plaintiff requested an administrative hearing which was held on October 20, 2010.  (R. at 28 – 57).  Plaintiff appeared to testify, represented by counsel, and there was testimony from a neutral vocational expert.  (R. at 28 – 57).  In a decision dated January 26, 2011, the Administrative Law Judge ("ALJ") denied Plaintiff's claims for DIB and SSI benefits.  (R. at 9 – 23).  Plaintiff then terminated his prior counsel and retained his present attorney to appeal his claim.  (Docket No. 11-1).  She prepared and filed a request for review of the ALJ's decision by the Appeals Council, along with new and material evidence which was not presented to the ALJ due to alleged errors by Plaintiff's former counsel.  (*Id.* at 1-5).  The Appeals Council denied the request for review on August 24, 2012, thereby making the decision of the ALJ the final decision of the Commissioner, and the alleged new evidence was not incorporated into the record below.  (R. at 1 – 3).

Plaintiff filed his Complaint in this Court on October 19, 2012.  (Docket No. 3).  Defendant filed his Answer on December 21, 2012.  (Docket No. 5).  Plaintiff then filed a Motion for Summary Judgment and Brief in Support on February 25, 2013. (Docket Nos. 10, 11).  Defendant responded by filing a Motion for Summary Judgment and Brief in Support on March 18, 2013. (Docket Nos. 13, 14).  The motions are now fully briefed and ripe for disposition.

III.  STATEMENT OF FACTS

A.  General Background

Plaintiff was born on August 17, 1967, and was forty three[2] years of age at the time of his administrative hearing.  (R. at 33).  He completed school through the eleventh grade, and did not earn a GED thereafter.  (R. at 33-34).  While in high school, Plaintiff attended a vocational school where he studied culinary arts. (R. at 266).  Plaintiff has never married, (R. at 143), and

---

[2]  Plaintiff is defined as a "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

lives with his mother, brother and eighteen year-old daughter whom he has had custody of since she was four years old. (R. at 143, 151, 266). Plaintiff was most recently employed as a press operator, (R. at 34), and reported that this employment ended in October, 2006. (R. at 35).

In his own self-report, Plaintiff claimed that he could not work due to physical restrictions stemming from knee and neck injuries, as well as an addiction to opiates and depression. (R. at 209). Plaintiff also stated that he suffered from panic attacks, which caused him to excuse himself from work on occasion. (R. at 37). He testified that he did not have any problems with self-care, (R. at 43), and was capable of performing household chores including washing dishes, doing laundry, sweeping and vacuuming. (R. at 44). However, Plaintiff averred that as a result of his memory deficiencies, (R. at 42), his mother performed most of the household chores. (R. at 43).

Plaintiff spends the majority of his day watching television, (R. at 45), but also reads and completes crossword puzzles and word searches. (R. at 188). He testified that he did not have any problems getting along with other people, (R. at 42), and had started going back to church and attending Bible studies. (R. at 269).

B. Physical Treatment History

Plaintiff was admitted to Western Pennsylvania Hospital, Forbes Regional Campus, ("Forbes Regional"), in Monroeville, Pennsylvania, on October 2, 2006, seeking treatment for right knee pain that had been ongoing for six months. (R. at 248-49). Plaintiff reported that this pain had increased on October 1, 2006, when his knee gave out while moving furniture, causing him to fall down "some steps." (*Id.*). He exhibited pain upon physical examination of his right

knee and was prescribed Percocet[3]. (*Id.*). Plaintiff was further instructed to follow up with Dr. Gerald Byers in four days, and to return to the emergency room if the pain worsened. (*Id.*).

According to the record, Dr. Gerald Byers referred Plaintiff to Dr. David Neuschwander, an orthopedic specialist, whom Plaintiff first saw on October 12, 2006. (R. at 260). Dr. Neuschwander performed physical and x-ray exams of Plaintiff and determined that he suffered from a right knee lateral meniscal[4] tear with possible loose bodies, right knee medial compartment degenerative arthritis with chronic anterior cruciate ligament ("ACL")[5] tear. (*Id.*). Dr. Neuschwander scheduled Plaintiff to have arthroscopic surgery on his right knee on November 3, 2006, at UPMC Surgery Center in Monroeville. (*Id.*).

Following his operation, Plaintiff visited Dr. Neuschwander on November 7, 2006. (R. at 259). At that appointment, Dr. Neuschwander noted that Plaintiff had sustained a chronic ACL tear with a lateral meniscal tear, changes in the medial femoral condyle and medial tibial plateau, and changes in the lateral femoral condyle. (*Id.*). According to Dr. Neuschwander, Plaintiff had suffered significant mild degenerative changes for his age, and he prescribed Plaintiff a physical therapy program and Tylenol to be used as needed. (*Id.*). Plaintiff was also directed to be off work for four weeks. (*Id.*).

Shortly thereafter, on November 14, 2006, Plaintiff was again seen by Dr. Neuschwander, having called the office several times in the interim requesting additional pain medication. (R. at 258). Dr. Neuschwander instructed Plaintiff to cut back on his pain

---

[3]     "Percocet is a combination of acetaminophen and oxycodone, used to relieve moderate to severe pain. Acetaminophen is a less potent pain reliever that increases the effects of oxycodone, which is an opioid, and may be habit-forming." Drugs.com, Percocet, *available at* http://www.drugs.com/percocet.html (last visited June 7, 2013).
[4]     *See* "Meniscus," "A crescentic intraarticular fibrocartilage found in certain joints. A crescentic fibrocartilaginous structure of the knee and the acromioclavicular, sternoclavicular, and termpropromandibular joints." Stedman's Medical Dictionary, 1184 (28th ed. 2006).
[5]     *See* "Anterior cruciate ligament," "An anterior cruciate ligament injury is the over-stretching or tearing of the anterior cruciate ligament (ACL) in the knee. A tear may be partial or complete." U.S. National Library of Medicine National Institutes of Health, Anterior cruciate ligament injury, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/001074.htm (last visited June 7, 2013).

medication, to begin his physical therapy program and to return for reevaluation in four weeks. (*Id.*). In the meantime, Plaintiff was instructed to remain off of work. *(Id.)*.

Before the end of these four weeks, on November 21, 2006, Plaintiff established treatment with a primary care physician, Daniel J. Carter, M.D. (R. at 246). Plaintiff reported to Dr. Carter that he was running out of Vicodin.[6] (*Id.*). Dr. Carter reviewed Plaintiff's medications and instructed that he return in three months for follow-up. (*Id.*).

Plaintiff returned to Dr. Neuschwander as scheduled on December 14, 2006. (R. at 257). Upon physical examination Plaintiff exhibited pain when pressure was applied over his patellar tendon[7] origin, and Dr. Neuschwander diagnosed Plaintiff with right knee patellartendinitis.[8] (*Id.*). Plaintiff was told to continue with his physical therapy program and to continue taking his prescribed medication, Motrin. (R. at 257).

Unrelated to his knee injury, Plaintiff visited the emergency room at Forbes Regional on January 3, 2007, (R. 251-52), as a result of pain to his scrotum. (*Id.*). Plaintiff was diagnosed with acute epididymitis,[9] was prescribed doxycycline[10] and was instructed to follow-up with Dr. Brunning. (*Id.*).

Plaintiff's final visit to Dr. Neuschwander was on January 11, 2007, where he complained of continued moderate discomfort in his right knee. (R. at 256). Upon examination,

---

[6]     "Vicodin is a combination of acetaminophen and hydrocodone, which like Percocet is used to relieve moderate to severe pain. Hydrocodone is an opioid and may be habit-forming." Drugs.com, Vicodin, *available at* http://www.drugs.com/vicodin.html (last visited June 7, 2013).

[7]     "The patellar tendon connects the knee cap to the shin bone." PubMedHealth, Anterior Knee Pain, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001488/ (last visited June 7, 2013).

[8]     "Tendinitis occurs when there is inflammation, irritation or swelling of a tendon, which is the structure that connects      muscle      to      bone."      PubMedHealth,      Tendinitis,      *available      at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002209/ (last visited June 7, 2013).

[9]     "Epididymitis is an inflammation of the epididymis, which is the tube that connects the testicle with the vas deferens, and is usually caused by the spread of a bacterial infection from the urethra, prostate or bladder." PubMedHealth, Epididymitis, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002258/ (last visited June 7, 2013).

[10]     "Doxycycline is an antibiotic used to treat bacterial infections." Drugs.com, Doxycycline, *available at* http://www.drugs.com/ doxycycline.html (last visited June 7, 2013).

Plaintiff exhibited less tenderness over his patellar tendon origin than during his previous visit. (*Id.*). He was instructed to continue with his physical therapy program and remain out of work until the next office visit in four weeks. (*Id.*).

On April 24, 2007, Plaintiff established treatment with Edward J. Garofolo, M.D., a primary care provider. (R. at 305-11). Plaintiff sought treatment for continued right knee pain and also sought a refill of his pain medication prescription. (*Id.*). Plaintiff told Dr. Garofolo that he had two knee surgeries and received weekly injections in his right knee from his orthopedic surgeon. (*Id.*). Dr. Garofolo diagnosed Plaintiff with hyperlipidemia,[11] noting that Plaintiff denied any chest pain, shortness of breath with exertion, nocturnal dyspnea or palpitations. (*Id.*). Dr. Garofolo told Plaintiff he was not comfortable refilling his narcotic medications monthly, and would refer him to a pain management physician. (*Id.*). Plaintiff indicated that he would make an appointment to see Dr. Chen for pain management. (*Id.*). Dr. Garofolo provided him with a refill of his Percocet prescription and scheduled him to return to have blood work done related to his high blood pressure. (*Id.*). Following Plaintiff's initial diagnosis of hyperlipidemia by Dr. Garofolo, he underwent regular blood testing to monitor his lipid levels. (R. at 306, 310, 319-20, 325-328, 331).

Plaintiff visited the Forbes Regional emergency room on July 1, 2007 when he ran out of Percocet and began to experience withdrawal symptoms. (R. at 280-82). According to the attending physician, Dr. Michael DiCaprio, Plaintiff indicated he wanted help weaning himself off of Percocet. (*Id.*). Plaintiff was given one Percocet while at the emergency room, was prescribed fifteen pills to take home with him, and was instructed to make follow-up

---

[11] "Hyperlipidemia is more commonly referred to as high cholesterol and occurs when there are elevated levels of lipids in the blood plasma, and can lead to heart disease, stroke and other complications." PubMedHealth, High Blood Cholesterol Levels, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001440/ (last visited June 7, 2013).

arrangements. (*Id.*). Plaintiff was provided with information for Dr. Hsu in the hospital's pain clinic, three local rehabilitation facilities, and also told he could follow up with his family physician, who could provide a recommendation. (*Id.*).

On July 5, 2007, Plaintiff visited Dr. Garofolo's office again, and was examined by Dr. Bohner. (R. at 313). Dr. Bohner noted that Plaintiff still had a few Percocet pills left from his emergency room visit a few days prior, and referred him to Dr. Hsu for pain management. (R. at 314). After Plaintiff returned to Dr. Garofolo's office on July 11, 2007, Dr. Garofolo wrote Plaintiff a prescription for Percocet to last him until his August 7, 2007 pain management appointment with Dr. Hsu. (R. at 316-18). At this appointment, Plaintiff told Dr. Garofolo that he was unhappy with his current orthopedic treatment and wanted to see another specialist. (*Id.*). Dr. Garofolo said he would refer Plaintiff to Dr. Rogal, an orthopedist, for a second opinion on Plaintiff's knee. (*Id.*).

In a letter to Plaintiff from Dr. Rogal dated July 23, 2007, Plaintiff was informed that he had degenerative arthritis both on the inside of his knee and under his kneecap. (R. at 387). Dr. Rogal instructed Plaintiff to treat with an anti-inflammatory medicine, such as Ibuprofen, and not with Percocet. (*Id.*). Dr. Rogal warned Plaintiff that he would likely need a knee replacement in the future, and if he is taking Percocet at that time, his post-operative pain would be unmanageable. (*Id.*).

Dr. Garofolo's August 9, 2007 notes indicate that Plaintiff had been seen by Dr. Rogal, who believed Plaintiff was a good candidate for a knee replacement, given the deterioration around his knee, and suggested that surgery be performed in September or October of 2007. (R. at 319-21). Dr. Garofolo also referenced Plaintiff's visit to Dr. Hsu on August 7 of that year, and noted that Plaintiff was waiting for his medications to arrive in the mail. Dr. Garofolo provided

Plaintiff with a note indicating that he was unable to work until after his surgery. (*Id.*).

When Plaintiff returned to Dr. Rogal on September 24, 2007, he reported that he was experiencing incapacitating and debilitating right knee pain that caused him to quit working, as he was unable to stand vertically on his right foot, as was required for a press operator. (R. at 276). Plaintiff told Dr. Rogal that he was not taking any narcotics at that time, and Dr. Rogal stated that the severity of Plaintiff's pain may be caused by a magnification from his previous use of narcotics. (*Id.*). Dr. Rogal administered an injection of Depo-Medrol[12] and Marcaine[13], and instructed Plaintiff to return in three months. (*Id.*).

Plaintiff saw Dr. Garofolo on November 13 and 30, 2007, to have blood work done. (R. at 325-31). On November 13, 2007, Plaintiff reported feeling well, and denied any symptoms of cardiovascular disease. (R. at 325-28). On December 4, 2007, Dr. Garofolo noted that the results of Plaintiff's November 30 blood test showed that his sugar and triglycerides were somewhat high, but "everything else looked good." (R. at 329-31). Between these two visits, Plaintiff sought treatment on November 20, 2007, at the Forbes Regional emergency room for burning with urination and the occurrence of blood in his urine. (R. at 279-80). Here, Plaintiff was diagnosed with a urinary tract infection and epididymitis. (*Id.*).

Plaintiff once again visited Dr. Garofolo on December 6, 2007, complaining of severe neck stiffness. (R. at 332-34). Dr. Garofolo identified that Plaintiff was experiencing a neck spasm and had decreased range of motion with flexion, extension and right and left turning as a result. (*Id.*). Plaintiff was prescribed moist heat and Flexeril.[14] (*Id.*). At his follow up

---

[12] "Depo-Medrol is a corticosteroid that reduces inflammation." Drugs.com, Depo-Medrol, *available at* http://www.drugs.com/ depo-medrol.html (last visited June 7, 2013).

[13] "Marcaine is a local anesthetic." Drugs.com, Marcaine, *available at* http://www.drugs.com/ marcaine.html (last visited June 7, 2013).

[14] "Flexeril is a muscle relaxant used to treat skeletal muscle conditions." Drugs.com, Flexeril, *available at* http://www.drugs.com/ flexeril.html (last visited June 7, 2013).

appointment regarding his urinary tract issues one week later, Dr. Garofolo performed a physical exam and referred Plaintiff to a urologist for further treatment. (R. at 335-37).

On January 15, 2008, Plaintiff again visited Dr. Garofolo, complaining of continued neck pain which had somewhat subsided since his last visit. (R. at 338-41). Dr. Garofolo noted that Plaintiff was experiencing a mild to moderate spasm of his paraspinal muscles and mildly decreased range of motion, though he identified no spinal tenderness or neurological deficits. (*Id.*). Plaintiff also requested a refill of his Flexeril prescription, (*Id.*), which Dr. Garofolo ordered along with an x-ray of Plaintiff's neck and physical therapy. (*Id.).* Additionally, Dr. Garofolo provided Plaintiff with a referral to Dr. Kasdan to help with his chronic knee pain, and instructed Plaintiff to consult with his insurance company to find a urologist within his network. (*Id.*). The results of Plaintiff's x-ray showed a reduction of disk space as well as a reduction in the C5 vertebrae[15] size, and Dr. Garofolo ordered an MRI of his cervical spine to determine if Plaintiff had any compression of the disk or vertebrae. (*Id.*). As a result of Plaintiff's MRI results, which showed herniated/bulging disks in his neck, and associated spasms of muscles, Dr. Garofolo referred Plaintiff to a neurosurgeon. (R. at 342-45).

Plaintiff returned to Dr. Garofolo's office on February 14, 2008, and indicated that the Cortisone injections were no longer relieving his knee pain, that he had scheduled an appointment with Dr. Kasdan for March 20, 2008, and that he needed a refill of his prescriptions to hold him over until then. (R. at 342-45). Dr. Garofolo noted that Plaintiff had an MRI for his knee scheduled for the following week, and refilled his medications until he could be seen by Dr. Kasdan. (*Id.*). Plaintiff next visited Dr. Garofolo on March 11, 2008, where he complained that the pain in his knee had increased and ached constantly, and that his leg tired more quickly. (R.

---

[15] "The fifth cervical (neck) vertebra from the top." MedicineNet.com, C5 (cervical vertibra), *available at* http://www.medterms.com/script/main/art.asp?articlekey=11063 (last visited June 7, 2013).

at 346-48).  Upon examination, Plaintiff did not have any swelling, redness or heat on his knee, and he was told to continue his medications as ordered. (*Id.*).

On March 12, 2008, Plaintiff was seen for his neck pain by neurosurgeon Dr. El-Kadi. (R. at 295-97).  Plaintiff reported to Dr. El-Kadi that he experienced intermittent and severe neck pain and intermittent and mild left upper extremity pain which radiated to his elbow. (*Id.*).  Dr. El-Kadi reviewed Plaintiff's February 22, 2008 MRI, and noted right C5-6 foraminal stenosis with disc/osteophyte[16] and foraminal narrowing that was moderate on the left. (*Id.*).  Dr. El-Kadi told Plaintiff there was no indication for surgery at that time, as he had not yet received the full benefit of conservative treatment. (*Id.*).  Dr. El-Kadi prescribed Mobic[17] to be taken after use of a Medrol Dosepak,[18] Vicodin, and a refill of Flexeril. (*Id.*).  Dr. El-Kadi also instructed Plaintiff to receive a nerve conduction study[19] and EMG,[20] (*Id.*), and to follow-up as-needed. (*Id.*).   At his follow-up appointment on April 15, 2008, Plaintiff requested and received a referral to Dr. Lamperski, a pain management specialist within Plaintiff's insurance network.  (R. at 349-50). Plaintiff returned to Dr. Garofolo on April 18 and May 6, 2008 to have his disability papers filled out, which Dr. Garofolo's notes indicate were for temporary disability of less than 12 months. (R. at 352-58, 365).  During this visit, Plaintiff told Dr. Garofolo that he had cancelled his next pain management appointment, was planning on rescheduling with Dr. Chen, and wanted Dr. Garofolo to provide him with medication to get him through until that appointment. (R. at 356-

---

[16]    "A bony outgrowth or protuberance." <u>Stedman's Medical Dictionary</u>, 1391 (28th ed. 2006).

[17]    "Mobic is a nonsteroidal anti-inflammatory medication used to treat pain or inflammation." Drugs.com, Mobic, *available at* http://www.drugs.com/ mobic.html (last visited June 7, 2013).

[18]    "Methylpresdnisolone is a steroid that prevents the body's release of substances that cause inflammation." Drugs.com, Methylpresdnisolone, *available at* http://www.drugs.com/methylpresdnisolone.html (last visited June 7, 2013).

[19]    *See* "Nerve conduction velocity (NCV)," which is "a test to see how fast electrical signals move through a nerve." U.S. National Library of Medicine National Institutes of Health, Nerve conduction velocity, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/001074.htm (last visited June 7, 2013).

[20]    "Electromyography," which analyzes nerve and muscle electrical activity. Harvard Health Publications, Electromyography and Nerve Conduction Studies (EMG), *available at* http://www.health.harvard.edu/diagnostic-tests/electromyography-and-nerve-conduction-studies.htm (last visited June 7, 2013).

58).  Dr. Garofolo advised Plaintiff that he would not provide him with any pain medication, and strongly cautioned Plaintiff that if he continued his pattern of jumping from one pain management physician to another, no physician would agree to treat him and his insurance company would impose restrictions. (*Id.*).

Plaintiff underwent a physical residual functional capacity ("RFC") assessment by state agency evaluator Frank S. Bryan, M.D. on June 5, 2008. (R. at 379-85).  Dr. Bryan diagnosed Plaintiff with right knee severe anterior and medial compartment degenerative arthritis and cervical foraminal stenosis[21] right C5-C6. (*Id.*).  The following exertional limitations were established: Plaintiff could occasionally lift and/or carry twenty pounds and frequently carry ten pounds; was limited to standing and/or walking for two hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; and was unlimited in his ability to push and/or pull, aside from his previously noted restrictions in lifting and/or carrying. (*Id.*).  In Dr. Bryan's opinion, Plaintiff would be occasionally limited in the following postural movements: using ramps, climbing stairs and ladders, crawling, crouching and kneeling. (*Id.*).  Additionally, Plaintiff would be frequently limited in balancing and stooping.  (*Id.*).  Finally, Dr. Bryan noted that Plaintiff should never climb ropes or scaffolds. (*Id.*).   However, Plaintiff had no manipulative, visual, or communicative limitations, and his environmental limitations were unaffected, except that Plaintiff was recommended to avoid concentrated exposure to hazards. (*Id.*). Dr. Bryan found Plaintiff's statements to be partially credible based on the evidence in the record, (*Id.*), and noted that Plaintiff provided inconsistent information regarding his daily

---

[21]      "Cervical foraminal stenosis is a narrowing of the cervical disc space." Spine Health.com, Cervical Foraminal Stenosis, *available at* http://www.spine-health.com/conditions/spinal-stenosis/cervical-foraminal-stenosis (last visited June 7, 2013). "There are seven cervical discs that act as a shock protector between the seven cervical vertebrae." Spine Health.com, Cervical Discs, *available at* http://www.spine-health.com/conditions/spine-anatomy/cervical-discs (last visited June 7, 2013). "The seven cervical vertebrae, C1-C7, begin at the base of the brain and extend through the upper to middle back." Spine Health.com, Cervical Vertebrae, *available at* http://www.spine-health.com/conditions/spine-anatomy/cervical-vertebrae (last visited June 7, 2013).

activities and his alleged disabling impairments. (*Id.*).

Finally, in a June 9, 2008 letter, Dr. Rogal advised Plaintiff that while he may eventually need a knee replacement, given his relatively young age, a more conservative treatment should be first attempted. (R. at 388). To this end, Dr. Rogal advised that prior to scheduling a knee replacement surgery, he wanted to see what result could be obtained from a Synvisc[22] injection treatment. (*Id.*).

### C. Mental Treatment History

Plaintiff first presented to UPMC Western Psychiatric Institute and Clinic, ("the clinic"), on August 20, 2001. (R. at 386). He complained of anxiety attacks beginning about one year prior to this visit, occurring about three to four times per week and lasting up to fifteen minutes per episode. (*Id.*). During these attacks Plaintiff reported feeling nervous, on edge, with shortness of breath, racing heart, feeling flushed and sweating. (*Id.*). Plaintiff reported that he first experienced psychiatric symptoms several years prior to this meeting when he began exposing himself in public. (*Id.*). Plaintiff was arrested four times for this behavior, and underwent court-ordered therapy. (*Id.*). Prior to this visit, Plaintiff had not been on any psychiatric medications. (*Id.*). He was diagnosed with Panic Disorder without agoraphobia[23] and exhibitionism[24], and scored a 40 on the Global Assessment of Functioning Scale[25] ("GAF").

---

[22] "Synvic is a fluid that acts as a lubricant and shock absorber for joints, and is used to treat knee pain." Drugs.com, Synvic, *available at* http://www.drugs.com/synvic.html (last visited June 7, 2013).

[23] "A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided; often associated with panic attacks." Stedman's Medical Dictionary, 40 (28th ed. 2006).

[24] "A morbid compulsion to expose a part of the body, especially the genitals, with the intent of provoking sexual interest in the viewer." Stedman's Medical Dictionary, 682 (28th ed. 2006).

[25] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed.2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have

(*Id.*).  Plaintiff's suggested treatment was Zoloft[26] and Klonopin[27]. (*Id.*).

After an appendectomy on July 13, 2006, (R. at 300-04), Plaintiff visited Dr. Mohamed Ismael at the clinic for medication management. (R. at 394-95).  Plaintiff's diagnosis stated that he suffered from major depressive disorder, recurrent episode moderate and generalized anxiety disorder, and instructed him to return to the clinic in three months.  (*Id.*).  The next record of Plaintiff's visit to the clinic was on February 21, 2007, for another medication management visit with Dr. Ismael.  (R. at 262-63).  Thereafter, Plaintiff returned to the clinic to see Dr. Ismael several times before his last documented visit on September 15, 2010. (R. at  273-74, 389-90, 392-93, 398-99, 401-06, 408-10, 412-18).  Plaintiff also received individual insight therapy at the clinic on multiple occasions. (R. at 391, 419-20).

On April 20, 2007, Plaintiff was seen for a mental status exam by consulting Psychologist Cynthia Peterson-Handley, PhD. (R. at 265-71).  Dr. Peterson-Handley recorded Plaintiff's past drug and alcohol use and his extensive family history of mental illness, and noted, among other things, that he was a victim of molestation and abuse and that he felt responsible for the death of his stepmother at the hands of his father.  (*Id.*).  Plaintiff scored a 40 on the GAF scale at that time. (*Id.*). Dr. Peterson-Hadley diagnosed Plaintiff with all of the following: panic disorder; generalized anxiety disorder; major depressive disorder; bipolar disorder; learning disability; and, borderline intellectual functioning. (*Id.*).  She noted that Plaintiff's ability to understand, remember and carry out instructions were impaired, such that he had: slight limitations in the

"[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication." *Id.*

[26] "Zoloft is an antidepressant." Drugs.com, Zoloft, *available at* http://www.drugs.com/zoloft.html (last visited June 7, 2013).

[27] "Klonopin regulates chemicals in the brain that when not balanced, may cause anxiety, and is used to treat seizure and panic disorders." Drugs.com, Klonopin, *available at* http://www.drugs.com/klonopin.html (last visited June 7, 2013).

ability to make judgments on simple, work-related decisions; moderate limitations in the ability to understand, remember short, simple instructions; marked limitations in the ability to carry out short, simple instructions; and extreme limitations in the ability to understand and remember detailed instructions and to carry out detailed instructions. (R. at 270). Dr. Peterson-Handley also opined that Plaintiff had extreme limitations in his ability to: interact appropriately with the public and co-workers; respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting. (*Id.*).

In her more specific findings, Dr. Peterson-Handley suggested that Plaintiff had a "learning disability," "has a minimal level of abstract reasoning," "a borderline level of intellectual functioning," and "may have a short term memory problem that could impair his functioning with daily activities." (*Id.* at 267-68). She further concluded that Plaintiff had: problems with impulse control; poor social judgment; and exhibited a degree of insight. (*Id.* at 268). She also stated that she did not believe that Plaintiff could manage benefits in his own interest. (*Id.* at 271).

A psychiatric review technique was completed by state agency evaluator Arlene Rattan, Ph.D. on May 30, 2008. (R. at 366-78). In her evaluation, Dr. Rattan diagnosed Plaintiff with affective disorders but did not diagnose any severe mental impairment. (*Id.*). Plaintiff was found to be either not limited or mildly limited in all areas of functioning. (*Id.*). In terms of activities of daily living, Plaintiff had no restriction, and in maintaining social functioning, concentration, persistence and pace, Plaintiff had only mild restriction. (*Id.*). Dr. Rattan also noted that Plaintiff had no repeated episodes of decompensation of extended duration. (*Id.*).

Beginning on July 7, 2009, Plaintiff saw Dr. Somen and others at Kreinbrook Psychological Services for assistance weaning himself off of his opiate addiction. (R. at 423-

86).  Initially, Plaintiff visited Dr. Somen every week, but after two months his visit schedule changed to approximately every other week. (*Id.*).  The last visit of record was on October, 25, 2010. (*Id.*).  During the appointments, Plaintiff submitted to a urine screen to ensure he had not relapsed. (*Id.*). Plaintiff was also prescribed medications for withdrawal prevention. (*Id.*).

 At the time of his administrative hearing, Plaintiff reported that he was receiving counseling every two weeks from Joe Talamo, (R. at 37), was seeing Dr. Ismael, a psychiatrist, for his depression, (*Id.*), and was being treated for an opioid dependency. (*Id.*).

D. <u>Administrative Hearing</u>

 An administrative hearing regarding Plaintiff's application for DIB and SSI was held on October 20, 2010 in Latrobe, Pennsylvania before ALJ Marty R. Pillion. (R. at 28).  Plaintiff appeared with his attorney Steve Morrison, Esquire, and provided testimony as to his condition at that time. (R. at 30).  Linda Dezack, an impartial vocational expert, also testified. (*Id.*).

Plaintiff testified that the last day he worked was in 2005 or 2006, at which time he had been employed as a press operator for a few months. (R. at 34, 36).  Plaintiff also had recent work as a cook and an assembly worker. (R. at 34-35).  Plaintiff's brief employment with Otis Spunkmeyer, which he obtained through a placement agency, was also discussed. (R. at 35-36).

Plaintiff explained that he was physically restricted from working because he could not stay on his feet for extended periods of time, could not carry anything over five pounds, could not go up steps or ladders, could not crawl or kneel, and averred that he occasionally had a difficult time standing still. (R. at 37).

Plaintiff added that he was also limited in his employment because he experienced panic attacks. (*Id.*).  He detailed that he was receiving counseling every two weeks, saw a psychiatrist for his depression medication, and was treated for an opioid dependency. (*Id.*).  Plaintiff stated

that he was not currently taking any pain medication, (R. at 38), but was taking Zoloft, Klonopin and Trazodone[28] for his panic attacks or mental symptoms. (*Id.*). Plaintiff did not believe he was experiencing any side effects from the use of those prescriptions, but averred that a doctor he visited for memory loss suggested a lower dosage of Trazodone and Atenolol,[29] as these could be contributing to his memory deficiency. (R. at 38-39). When asked if he was experiencing any pain, Plaintiff replied that he had pain in his right knee and on the right side of his neck. (R. at 39). Plaintiff stated that he only sometimes uses a cane for ambulation and does so because it is more convenient to walk with a cane then to continually strap on the knee brace prescribed by his doctor. (*Id.*). According to Plaintiff, it had been about two years since he took any medications or received any treatment for his knee. (R. at 40). Plaintiff stated that if he sat longer than fifteen to twenty minutes, he had to elevate his leg to relieve some of the pain, (R. at 40-41), that he could stand for the same amount of time before he had to change positions, (*Id.*), and that he could only walk for about the same amount of time before it became painful. (*Id.*).

Plaintiff further testified that he could not lift more than five or ten pounds, and had no problems using his hands, reaching laterally, or reaching overhead. (R. at 41). He also averred that he could not squat, crouch or crawl. (R. at 41-42). With regard to his alleged memory problems, Plaintiff stated that he was prone to forgetting the days of the week, and could quickly forget what was being discussed during a conversation. (R. at 42). Plaintiff added that he did not have trouble getting along with people. (*Id.*). When asked about his difficulties maintaining attention and concentration, Plaintiff stated that as a student, he was put into the special education program because of his short attention span. (R. at 42-43).

---

[28]    "Trazodone is an antidepressant used to treat depression and anxiety disorders." Drugs.com, Trazodone, *available at* http://www.drugs.com/trazodone.html (last visited June 7, 2013).

[29]    "Atenolol is a beta-blocker that affects blood flow, and is used to treat chest pain and high blood pressure." Drugs.com, Atenolol, *available at* http://www.drugs.com/atenolol.html (last visited June 7, 2013).

Plaintiff stated that he experienced fatigue as evidenced by pains in his chest, and that before he began taking Trazodone, he had experienced difficulty sleeping. (R. at 43). Additionally, Plaintiff stated that he had no problems with self-care, but that while he was able to perform chores such as cleaning, vacuuming, doing the laundry or the dishes, his mother completed these tasks, as he would forget to perform them entirely, or would forget to complete tasks that he had started. (*Id.*). Plaintiff further stated that his mother did all of the household shopping, though he was not prevented from doing so by any obstacles, including the fact that the task required him to be around people. (R. at 44). Plaintiff had little to no outside activity, and stated that he liked to fish and enjoyed drawing. (R. at 44-45).

Following questioning by the ALJ, Plaintiff's attorney asked him a series of questions regarding his alleged memory deficiencies and ability to complete the same jobs he had in the past. (R. at 45-47). Plaintiff stated that he could not perform his prior job as a kitchen manager because it required him to stand for long periods of time, and many of the tasks involved lifting items. (R. at 47). He also stated that even if those physical tasks were not required of him, his panic attacks would prevent him from being able to perform the job. (*Id.*).

At the conclusion of Plaintiff's testimony, the ALJ asked the vocational expert whether a significant number of jobs existed in the national economy for a hypothetical individual of Plaintiff's age, education and past work experience, if he or she were limited in that he or she could only occasionally balance, stoop, kneel, squat, crouch, crawl, and climb ramps and stairs; could not climb ropes, ladders, or scaffolds; could perform routine, repetitive tasks, and make simple work-related decisions; could tolerate rare or infrequent changes in work setting; could occasionally interact with coworkers, supervisors, and the public; and could not tolerate exposure to extreme heat or cold, wetness, dampness, humidity, or vibration. (R. at 48-49). The vocational

expert replied that the hypothetical individual would be capable of working as a cashier for a restaurant, with 177,870 jobs in the national economy, as a newspaper carrier with 113 local jobs and 43,505 national jobs, and as a stock checker in the apparel industry with 46 local jobs and 16,480 national jobs available. (R. at 49-50). The vocational expert opined that the local economy consisted of the twelve counties in central western Pennsylvania region, including Westmoreland County. (R. at 50).

After the ALJ inquired as to whether a hypothetical individual who could only do sedentary work would be capable of performing the production worker job, the vocational expert stated that he or she could not. (*Id.*). The vocational expert then offered that such person could work as an "ampoule sealer," with 45 local jobs and 16,170 national positions available[30], (*Id.*), as a "hand bander," with 43 local and 16,170 national positions (R. at 51), or could perform "hand assembly" for the watch industry, with 150 local and 57,750 national positions available. (*Id.*).

Finally, the ALJ next asked the vocational expert to consider whether any of the aforementioned positions would be compromised if the same hypothetical individual, capable of performing only sedentary work, would be off task fifteen to twenty percent of the workday. (R. at 51). The vocational expert replied that being off task that long would compromise all of the aforementioned jobs and all competitive employment. (*Id.*).

E. Alleged New and Material Evidence

Plaintiff has also submitted alleged new and material evidence that was not presented to the ALJ due to an error by his former counsel.[31] (Docket Nos. 11, 11-1). These records include

---

[30] When asked to repeat this job, the vocational expert stated this time that there were 56 local jobs and 215,985 national positions available. (R. at 50).

[31] The Court notes that, among the medical records, is a letter from Dr. Rogal dated July 23, 2007, wherein he recounts Plaintiff's "severe degenerative arthritis" both inside his knee and under his kneecap. (*Id.* at 6). Dr. Rogal

treatment notes from a neurological consult conducted by Dr. Michael K. Sauter, MD, MSc, on October 7, 2010 – less than two weeks before the administrative hearing was held before the ALJ on October 20, 2010. (Docket No. 11-1 at 7-13). With respect to his alleged physical ailments, Plaintiff points out that Dr. Sauter's notes from October 2010 state that Plaintiff had his knee replaced. (*Id.* at 7). As to his alleged mental disabilities, Dr. Sauter's notes reflect that Plaintiff was referred for a neurological consult by Dr. Talamo, PhD due to complaints of memory loss and confusion. (*Id.* at 7).

Dr. Sauter recounts that Plaintiff reported decreased short term memory, a problem which he believed had worsened over the preceding three or four years, and which caused him to forget things such as doctor's appointments, times and conversations. (*Id.* at 8). He likewise advised of a history of multiple concussions and sporadic bilateral loss of vision. (*Id.*). On exam, Dr. Sauter noted that Plaintiff was "a well-appearing, early middle-aged man in no acute distress." (*Id.* at 9). As to Plaintiff's mental status, Dr. Sauter found that he scored a 26/30 on the mini-mental state exam, but noted that he had difficulty: remembering 3 words; spelling "world" backwards; repeating a sentence; placing numbers correctly around the clock; and, placing the hands of the clock at 3:40. (*Id.*). Dr. Sauter's impression was that Plaintiff "suffers from memory loss, depression and altered level of consciousness with a possible seizure disorder." (*Id.*). He also ordered an MRI of Plaintiff's brain and an electroencephalography test ("EEG") to determine if there was any evidence of a seizure. (*Id.*). He further recommended that Plaintiff decrease his dosages of Trazodone and Atenolol. (*Id.* at 9, 11). The records reflect that Plaintiff underwent the recommended EEG on October 26, 2013, a few days after the administrative

---

outlines a conservative treatment plan for same going forward but also notes that ultimately, Plaintiff will need a knee replacement. (*Id.*). However, this letter is already filed in the administrative record. (*See* R. at 387).

hearing. (*Id.* at 10). The notes from this exam state that Plaintiff had "progressive memory loss" and that it was an "abnormal EEG study" which was "suggestive of a focal seizure." (*Id.*).

## IV. STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[32], 1383(c)(3)[33]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The

---

[32]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[33]     Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## V.    DISCUSSION

In his decision, the ALJ denied DIB and SSI benefits after analyzing all five steps of the sequential evaluation process described above. (R at 11-23). The ALJ initially noted that Plaintiff met the insured status requirements of the Act through June 30, 2012 and found that he had not engaged in substantial gainful activity since his alleged onset date of April 1, 2007 at Step 1. (*Id.* at 11). The ALJ concluded at Step 2 that Plaintiff suffered from the following medically determinable severe impairments: cervical formational stenosis at level C5-6; arthritis in the right knee; a depressive disorder; an anxiety disorder; a personality disorder; and a history of opioid dependence. (R. at 11). The ALJ held that Plaintiff's elevated cholesterol level constituted a "non-severe" impairment, such that further review of same beyond Step 2 was not warranted. (*Id.* at 12). No further impairments are identified at Step 2, such as a learning disability or borderline intellectual functioning. (*Id.* at 11-12). The ALJ next found that Plaintiff's severe impairments did not meet any of the listings at Step 3. (*Id.*).

Based on the identified severe impairments, the ALJ determined that Plaintiff had the RFC to perform sedentary work, except that he would be unable to perform no more than occasional balancing, stooping, kneeling, squatting, crouching, crawling or climbing ramps-stairs, and could not climb ladders, ropes, or scaffolds. (R. at 13). He limited Plaintiff to the

performance of routine, repetitive tasks and simple work related decisions, rare or infrequent changes in work setting, and no more than occasional interaction with co-workers, supervisors or to the public. (*Id.*). Finally, the ALJ concluded that Plaintiff should have no exposure to hazards such as machinery or heights, or any exposure to extreme heat or cold, wetness, humidity, or dampness or vibration. (*Id.*).

Relying upon the testimony of the vocational expert, the ALJ concluded at Step 4 that after considering all of Plaintiff's impairments, he would be unable to perform any past relevant work, but that there were jobs in existence in the national economy that he could perform, such as an ampoule sealer, a hand assembler, a final assembler, a nut sorter and a product inspector. (R. at 21-22). The ALJ ultimately determined at Step 5 that Plaintiff was not disabled under the Act and denied his request for DIB and SSI benefits. (R. at 23).

On appeal, Plaintiff contends that the ALJ's decision is erroneous and necessitates a remand to the Commissioner for further proceedings. (Docket No. 11). He argues that a remand under sentence four of § 405(g) is warranted because the ALJ's decision is allegedly not supported by substantial evidence and alternatively maintains that a remand under sentence six of § 405(g) is appropriate so that the ALJ may consider purportedly new and material evidence concerning his claim for DIB and SSI benefits that he has now presented to the Court but was not admitted in the proceedings before the ALJ due to an error by his prior counsel. (*Id.*). Plaintiff raises a number of issues in support of his position that the decision is not supported by substantial evidence, including that the ALJ: (1) failed to discuss pertinent evidence which demonstrates that Plaintiff suffered from a severe physical impairment given his right knee ailments and thus, incorrectly concluded that he did not meet the appropriate listing and otherwise did not properly incorporate such limitation into the RFC assessment; (2) neglected to

acknowledge Dr. Peterson-Handley's diagnoses of a learning disability and borderline intellectual functioning as severe mental impairments, which likewise were not accounted for in the RFC; and, (3) posed a flawed hypothetical question to the vocational expert which did not properly reflect all of Plaintiff's credibly established limitations. (*Id.*). Defendant counters that the record evidence, as a whole, provides substantial evidence supporting the ALJ's decision to deny DIB and SSI benefits in this case and that the records provided by Plaintiff for the first time on appeal are neither new nor material such that Plaintiff's request for a sentence six remand such be refused. (Docket No. 14).

Having fully considered the parties' positions and the entire administrative record, the Court agrees with Plaintiff that the ALJ's decision is flawed with respect to his consideration of Plaintiff's mental impairments (or lack thereof), such that a remand is warranted for further proceedings under sentence four of § 405(g). *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, … a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). Specially, the Court finds that the ALJ failed to meaningfully discuss and consider the diagnoses by the consultative examiner, Dr. Peterson-Handley that Plaintiff suffered from borderline intellectual functioning and a learning disability (or expressly decide that these ailments constituted severe or non-severe impairments) at Step 2 and that the ALJ's RFC assessment did not fully account for these diagnoses or the related limitations identified by Dr. Peterson-Handley in her report under prevailing Third Circuit precedent. (*See* R at 9-23, 265-78). As such, the Court holds that the ALJ's denial of DIB and SSI benefits is not supported by substantial evidence. *See Burns,* 312 F. 3d at 118. Given that a remand is warranted on this basis alone, the Court declines to exhaustively address the other arguments raised by Plaintiff,

including whether the decision that his physical ailments do not render him disabled under the Act is supported by substantial evidence or if the new matters presented to the Court now warrant a remand for further proceedings under sentence six of § 405(g). Instead, the Court will remand the matter to the Commissioner with specific instructions to reopen and fully develop the record as to Plaintiff's claims for DIB and SSI benefits. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010); *see also Raisley v. Astrue*, Civ. A. No. 12-606, 2013 WL 440971, at *25 (W.D. Pa. Feb. 5, 2013) (citing same).

In reaching this decision, the Court understands the appropriate legal standard in analyzing alleged errors at Step 2 of the five-step sequential evaluation process in cases such as this one, i.e., where the ALJ allegedly fails to identify certain impairments as "severe"[34] but recognizes that the plaintiff has demonstrated the presence of other "severe" impairments and continues the analysis of the evidence beyond the initial Step 2 determination. *See Niglio v. Colvin*, Civ. A. No. 12-1583, 2013 WL 2896875, at *8 (W.D. Pa. June 13, 2013). As this Court recently held in *Niglio*, the ALJ's analysis at Step 2 to determine whether or not an alleged impairment is "severe," is no more than a "*de minimis* screening device to dispose of groundless claims." *Magwood v. Comm'r of Soc. Sec.*, 417 Fed. App'x 130, 132 (3d Cir. 2008) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F. 3d 541, 546 (3d Cir. 2003)). Step 2 merely serves a minimal gate-keeping function, and Plaintiff's burden to demonstrate a severe impairment is not an exacting one. *McCrea v. Comm'r of Soc. Sec.*, 370 F. 3d 357, 360 (3d Cir. 2004) (citing S.S.R. 85-28, 1985 WL 56856 at *3). Reasonable doubts regarding the evidence should be construed in the light most favorable to the claimant at Step 2. *Newell v. Comm'r of Soc. Sec.*,

---

[34]    A "severe" impairment is defined by the regulations as "any impairment . . . which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is not "severe" where the record demonstrates only "slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" *Id.*

347 F.3d 541, 547 (3d Cir. 2003)). Further, the use of Step 2 as a vehicle for the denial of benefits should, "raise a judicial eyebrow," and deserves "close scrutiny." *McCrea*, 370 F. 3d at 360-61. However, if the ALJ does not deny benefits at Step 2, but instead proceeds to analyze the claims under the remaining steps, a remand is not generally warranted due to the ALJ's failure to describe an alleged impairment as "severe" at Step 2, unless such error undermines the ALJ's analysis of the remaining steps and/or the ultimate disability determination. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)); *see also Niglio*, 2013 WL 2896875, at *8.

The parties appear to agree that the ALJ failed at Step 2 to identify borderline intellectual functioning and a learning disability as severe impairments or to explain why such ailments were non-severe, despite the fact that Dr. Peterson-Handley expressly opined that Plaintiff suffered from such impairments in her consultative examination report. (*See* Docket Nos. 11, 14). Both borderline intellectual functioning and learning disabilities, if properly supported, may constitute severe impairments. *See Beasich v. Comm'r of Soc. Sec.*, 66 F. App'x 419, n.8 (3d Cir. 2003) ("Borderline intellectual functioning that is supported by the record can be a severe impairment"). It is also well established that an ALJ is tasked with weighing all of the evidence of record and resolving conflicts in same. *See Burnett v. Commissioner of Social Securit*y, 220 F.3d 112, 121 (3d Cir. 2000). Further, when a conflict in the evidence exists, the ALJ may choose what evidence to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must also provide sufficient explication of the decision to enable meaningful judicial review of same. *See Fargnoli*, 247 F.3d at 41.

In this Court's estimation, the evidence of record as to whether Plaintiff has the severe impairments of borderline intellectual functioning and/or a learning disability conflicts such that Dr. Peterson-Handley concluded that Plaintiff was so impaired while the state agency file examiner, Dr. Rattan, opined that Plaintiff had, at most, a non-severe depressive disorder, NOS. (R at 265-71, 366-78).  At a minimum, the ALJ should have resolved this conflict in the evidence between the medical sources and provided an explanation as to how the evidence from Dr. Peterson-Handley was considered.  *See Burnett*, 220 F.3d at 121.  Thus, this aspect of the ALJ's decision at Step 2 is not supported by substantial evidence.

Defendant suggests that such error is harmless because the ALJ resolved Step 2 in Plaintiff's favor and then allegedly "assessed a comprehensive RFC that would accommodate a learning disability or borderline intellectual functioning," limiting Plaintiff "to only routine, repetitive tasks or simple work-related decisions with only rare or infrequent changes in work setting and occasional interaction with co-workers, supervisors, and the public."  (Docket No. 13 at  11-13).  This Court is not persuaded that the RFC in this case cured the ALJ's initial error in failing to consider Plaintiff's borderline intellectual functioning and learning disability as severe impairments because the limitations in the RFC which purportedly restricted Plaintiff to "only routine, repetitive tasks or simple work-related decisions" neither fully account for Dr. Peterson-Handley's diagnoses nor the other limitations she identified in her consultative report.  (*See* R. at 265-71).  Further, the ALJ's decision does not otherwise sufficiently explain why such evidence was discredited or outright rejected by the ALJ.  (*See* R. at 9-23).

"[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359, n.1 (3d Cir.1999)); *see also* 20 C.F.R. § 404.1545(a). "An ALJ must consider all

relevant evidence when determining an individual's [RFC.]" 20 C.F.R. § 404.1545(a); *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 41. It also must encompass all of the claimant's impairments, including those not deemed "severe." 20 C.F.R. § 416.925(a)(1). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(c)(2). The ALJ's finding of the RFC must be "accompanied by a clear and satisfactory explication of the basis on which it is based." *Fargnoli*, 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)).

In *Burns v. Barnhart*, 312 F.3d 113, 122-24 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that a limitation of a claimant to "simple repetitive one, two-step tasks" was insufficient to fully account for a diagnosis of borderline intellectual functioning, rendering the hypothetical question posed to the vocational expert incorporating such an RFC assessment unsupported by substantial evidence. The Court of Appeals reasoned that this type of limitation "could refer to a host of physical and mental limitations, such as a person's mechanical or small motor skills, his lack of initiative or creativity, or a fear of, or unwillingness to take on, unfamiliar tasks" and may "even encompass a lack of intelligence." *Id.* at 123. However, the Court of Appeals noted that such a limitation would not incorporate findings that the claimant was "borderline in the areas of reliability, common sense, ability to function independently, and judgment or that he manifests flightiness, disassociation, oppositional tendencies, and difficulties in comprehension." *Id.* *Burns* therefore teaches that there is no *per se* rule in the Third Circuit that a limitation to simple, repetitive one, two-step tasks or the like is sufficient to account for all

of the potential limitations of a claimant diagnosed with borderline intellectual functioning. *Id.* Instead, "greater specificity is required" in such circumstances. *Id.*

In this Court's opinion, the ALJ's RFC assessment in this case is not supported by substantial evidence because it does not fully account for all Dr. Peterson-Handley's diagnoses nor her identified limitations and the ALJ did not meaningfully explain why her opinions on these issues were discredited, rejected or ignored. (*See* R. at 9-23, 265-71). Admittedly, the ALJ cited Dr. Peterson-Handley's report in several instances throughout his decision (*see* R at 9-23), noting that she assessed Plaintiff with a GAF score of 40 and some of the limitations she made with respect to Plaintiff's work-related functional abilities, including a possible short-term memory problem, marked restrictions in carrying out short, simple instructions and extreme limitations in interacting with co-workers and the public and in his ability to respond to work pressures. (*See* R at 20). The ALJ also commented at a later point in his opinion that Dr. Peterson-Handley's report was afforded "diminished weight" "insofar as [it] suggests an inability to perform any work activity." (R. at 21).

However, this Court believes that in light of *Burns,* 312 F.3d at 122-24, the ALJ's limitation of Plaintiff to "routine, repetitive tasks or simple work related decisions" does not completely incorporate Dr. Peterson-Handley diagnoses or all of the relevant findings made in support of same. (*See* R. at 265-71). In this regard, the decision is simply unclear as to how Dr. Peterson-Handley's diagnoses were considered by the ALJ because they are not mentioned and he therefore does not explain how they were weighed against the other medical evidence in the record, if at all. (*See* R. at 9-23). For example, it appears to the Court that the ALJ seemingly focused on Plaintiff's lack of intelligence in reaching his decision to restrict Plaintiff to "routine, repetitive tasks or simple work related decisions" by referencing his low GAF scores and the

cited limitations in handling simple instructions. (R. at 20). Yet, the ALJ gave "diminished weight" to Dr. Peterson-Handley's overall opinion while ignoring her diagnosis of Plaintiff's learning disability and made no explicit findings discrediting this evidence. (*Id.*). The ALJ likewise made no mention of the diagnosis of borderline intellectual functioning and simultaneously overlooked the type of broader limitations which are cited by the Court of Appeals in *Burns* as falling outside the scope of the restriction to simple, routine, repetitive tasks. To this end, Dr. Peterson-Handley specifically found, among other things, that Plaintiff has a minimal level of abstract reasoning, problems with impulse control, poor social judgment and was unable to manage benefits in his own interest. (R. at 267-68, 271). As in *Burns*, these findings, if credited, would likely fall outside the scope of the limitation to routine, repetitive tasks and simple work related decisions. *See Burns*, 312 F.3d at 122-24. Alternatively, prior to discrediting this evidence, the ALJ was required to point to contrary medical evidence in the record and explain his rationale for rejecting same. *See Fargnoli*, 247 F.3d at 37, 41. When considered as a whole, it is clear to this Court that Dr. Peterson-Handley opined that Plaintiff suffered from broader mental ailments than is reflected by the GAF score of 40 she assessed, and her opinions deserved a much more robust explanation prior to being given "diminished weight" by the ALJ. (R. at 265-71).

On this point, it is well established that an ALJ may not make speculative inferences from medical reports and is not free to employ his own lay opinion against that of a physician who presents competent medical evidence, especially in a case involving a mental disability. *See Fargnoli*, 247 F.3d at 37; *see also Morales*, 225 F.3d at 319 (quoting *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)) ("The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability.").

The Court of Appeals has also "consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician," and that it is similarly improper to credit a non-examining physician over a physician who has examined the claimant. *Brownawell*, 554 F.3d at 357. Thus, reliance on a file examiner's opinion to discredit other well-supported medical evidence of record is questionable, at best. *See Lehman v. Astrue*, 153 Soc. Sec. Rep. Serv. 335, 2010 WL 2034767 at *13 (W.D. Pa. May 18, 2010). Further, a District Court cannot substitute its own factual findings, or those proposed by Defendant, in order to rectify a lack of factual findings in the ALJ's decision on a particular issue. *See Fargnoli,* 247 F.3d at 44 n. 7 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (noting that the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.")).

In an effort to defeat Plaintiff's arguments, Defendant engages in what amounts to a post-hoc rationalization of how the ALJ may have weighed the medical opinions of record and reached his ultimate determination denying benefits. (Docket No. 14 at 5-6). Indeed, Defendant cites a host of treatment notes from medical sources which may support rejecting Dr. Peterson-Handley's diagnoses of borderline intellectual functioning and a learning disability. (*Id.*). However, the ALJ made no such findings and this Court may not speculate as to how the ALJ possibly weighed this evidence and engage in its own fact-finding on appeal to save an otherwise flawed decision. *See Fargnoli,* 247 F.3d at 44 n. 7 (quoting *Chenery*, 318 U.S. at 87). At most, this Court is left to evaluate the ALJ's crediting of a file examiner's cursory opinion that Plaintiff possessed no severe mental impairments over the findings of the consultative examiner, who actually examined Plaintiff prior to reaching her conclusions. (R at 265-71, 366-78). In

addition, the cited file examiner's report does not reference Dr. Peterson-Handley's consultative examination at all, let alone her diagnoses of borderline intellectual functioning and a learning disability or any of her other relevant findings. (R. at 366-78). This is simply not substantial evidence. *See Lehman*, 2010 WL 2034767 at *13.

For these reasons, the Court will vacate the ALJ's decision and remand the matter pursuant to sentence four of § 405(g). As is noted above, the Court further orders that the administrative record be reopened and fully developed. *See Thomas*, 625 F.3d at 800. The newly reopened record should include the evidence that Plaintiff contends is "new and material" in this action and was not provided to the ALJ due to an alleged error by his former counsel.[35] (*See* Docket No. 11-1). To this end, the Court believes that the medical evidence from Plaintiff's examination by Dr. Sauter on October 7, 2010 and the results of the EEG test on October 26, 2010, may bear on the ALJ's evaluation of medical evidence of record, including Dr. Peterson-Handley's consultative examination, as well as the credibility of Plaintiff's subjective complaints of his mental impairments. (*Id.*). Of note, Dr. Sauter commented that Plaintiff had: progressive

---

[35]     The Court notes that it need not reach a decision as to whether a sentence six remand is appropriate in this case because the case will be remanded pursuant to sentence four of § 405(g). However, a case may be remanded to the Commissioner under sentence six if the reports constitute "new" and "material" evidence and Plaintiff establishes "good cause" for failing to present it to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 592–93 (3d Cir.2001). Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. *Sullivan v. Finklestein*, 496 U.S. 617, 626, 110 S. Ct. 2658, 110 L.Ed.2d 563 (1990); *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir.1984). Evidence is "material" if it is relevant, probative, and there is a reasonable possibility it would have altered the outcome of the Commissioner's determination. *Id.* The claimant must show "good reason" for why the evidence was not previously brought before the ALJ. *Matthews*, 239 F.3d at 595. A claimant must satisfy all three requirements (new, material and good cause) in order to justify a remand. *See Szubak*, 745 F.2d at 833.

        At this stage, Defendant has not challenged Plaintiff's position that he has established good cause based on the error of his former attorney but argues only that the records are neither new nor material, suggesting that they are cumulative to the information already present in the record. (*See* Docket No. 14). Setting aside the issue of good cause, which is unchallenged, this Court fails to see how medical records from a neurological consult and subsequent testing by a neurologist who had never previously examined Plaintiff would be qualified as cumulative in nature such that a sentence six remand would not be separately warranted in this case. *See Matthews*, 239 F.3d at 593. As is noted in the body of this decision, such evidence is certainly relevant to the ALJ's consideration of the medical evidence of record and of the credibility of Plaintiff's subjective complaints of mental impairments, which were discredited. Whether such evidence is sufficient to render Plaintiff disabled under the Act is an issue to be decided on remand.

memory loss; a history of concussions; sustained a focal seizure; had difficulty maintaining his own finances; a possible attention deficit disorder; and, a learning disability. (*Id.*). All of this proffered evidence should be fully and fairly evaluated on remand.

## VI. CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Summary Judgment [10] is GRANTED, IN PART, and DENIED, IN PART; Defendant's Motion for Summary Judgment [13] is DENIED; the decision of the ALJ is VACATED; and this matter is REMANDED for further consideration, consistent with this Memorandum Opinion. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: June 21, 2013

cc/ecf: All counsel of record.